UNITED STATES, Appellee

v.

CHARLIE LONDON, JR., Sergeant, U. S. Army, Appellant

4 USCMA 90, 15 CMR 90

No. 3654

Decided March 26, 1954

 
██

CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Joseph B. Axelman, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Tried by a general court-martial in Germany for housebreaking and for the larceny of 162 pounds of Government coffee, in violation respectively of Articles 130 and 121, Uniform Code of Military Justice, 50 USC §§ 724 and 715, the accused was found guilty of the latter offense. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The conviction was affirmed by intermediate appellate tribunals. We granted review to consider the following issue:

"Whether the reconsideration of the findings of not guilty by the court was proper."

Implicated with the accused in the commission of the offense were a Private Davis and a Corporal Peters. However they appeared as prosecution witnesses against the accused. According to their testimony, they met the accused in the early afternoon of December 10, 1952. He told them that he had the keys to the mess hall and he suggested that they steal some coffee. That night, the three met again and drove in the accused's car to the vicinity of the mess hall. The accused gave the keys to Davis. He remained outside as a lookout while the other two went into the building. Three fifty-four pound bags of coffee were removed. These were loaded into the trunk of the accused's car. Leaving Davis behind, the accused and Peters then drove to a gasthaus where Peters sold one of the bags of coffee. They proceeded to another gasthaus where a second bag was sold by Peters. The third bag was brought by the accused to his girl friend's apartment and left with her. About noon on the following day, the coffee and the keys to the mess hall were found in the girl friend's apartment by a Criminal Investigation Division agent.

In a pretrial statement, the accused said that he had been asked by Peters to take some "stuff" off the post. He drove Peters to two taverns where Peters disposed of two bags of coffee. At Peters' request he agreed to take a third bag to his girl friend's apartment and keep it there for Peters. At that time Peters also gave him some keys to keep for him.

At the trial, the accused testified that he met Peters in town about 11:00 pm on December 10. Peters asked him for a ride back to the Kaserne. On arrival,

92

the accused parked his car about 100 yards from the mess hall. Leaving his lights on and the motor running, he went into the orderly room to obtain his overnight pass. When he returned to the car about fifteen minutes later, he found Peters nearby. Since Peters had previously asked him for a ride back to town after he had obtained his pass, he and Peters drove into town. On reaching the town limits, Peters informed the accused that he had some coffee in the car. The accused ordered Peters out of the car, but the latter prevailed upon him to drive to a gasthaus where he would unload the coffee. The accused acceded because he was in a hurry to keep a date with a girl who wanted him to take her to Baden-Baden. For the same reason, he agreed to take Peters to the second gasthaus and to bring the remaining coffee to his girl's apartment. After he dropped off the coffee at the apartment, the accused kept his date with the other girl. About seven the next morning, the accused asked Peters to get the coffee out of the apartment. When Peters refused, the accused went to the apartment and discussed with his girl friend the disposition of the coffee. Several hours later, the Criminal Investigation Division agent entered. However, just prior to his arrival, the accused and his girl had decided to return the coffee.

At the close of the case, a defense motion for a finding of not guilty was denied by the law officer without objection by the court. Thereafter, the law officer instructed the court on the elements of the offenses charged and the law applicable to the case. Included in the instruction was a statement of the law applicable to aiders and abettors. The law officer also distinguished a principal in the commission of the substantive offense from a person who merely acts as an accessory after the fact. In that connection, he instructed the court that the offense of an accessory after the fact is not a lesser included offense to those charged. He further advised the court that if it should find that the accused was an accessory after the fact, it must acquit him.

After the court had deliberated for some time, it called the law officer and the reporter into its closed session to put its findings into proper form. The following transpired:

"LAW OFFICER: Let the record show that the court has requested the law officer to appear before it in its closed session to put its findings in proper form. The members of the court who were present when the court closed to make its findings, the law officer, and the reporter are the only personnel present. Has the court made its finding?

"PRESIDENT: The court has made its findings.

"LAW OFFICER: Have they been reduced to writing; have you written them out?

"PRESIDENT: No. We haven't written them out.

"LAW OFFICER: What is the finding of the court?

"PRESIDENT: The finding of the court is: Of the specification to Charge I, not guilty, and to Charge I not guilty; of the specification to Charge II not guilty; and as to Charge II not guilty. The court further finds that, instead, the accused is guilty of Article of War 78, a violation thereof.

"LAW OFFICER: In view of the findings of the court, we will have to re-open and I will have to re-advise the court with respect to the law and with respect to the propriety of a finding under Article 78. I covered that in my instruction and I apparently will have to do it over again because any instructions I have to give will have to be done in open court. So, we will re-open the court and I will advise you again with respect to Article 78."

When the court reopened, the law officer made a statement regarding his appearance before the court in its closed session. He said that from the purported findings it was apparent that his earlier instructions were not clear, and that further instructions were required. He then proceeded to instruct again on the difference between one who

**93**

aids and abets in the commission of the substantive offense and thereby becomes a principal, and one who is only an accessory after the fact. In concluding this instruction, he said:

". . . Now as I previously advised the court, and I repeat that advice, that the offense of being an accessory after the fact is not a lesser included offense either to the offense of housebreaking with intent to commit larceny or of the offense of larceny, and, therefore, a finding of guilty of being an accessory after the fact would be a finding of an offense with which this accused is not charged and would be a finding of an offense which is not a lesser included offense to an offense charged, so that a finding of guilty under Article 78, being an accessory after the fact, would not be a proper finding in this case. If the court in its deliberations should not be convinced beyond a reasonable doubt that the accused is guilty of the offense of housebreaking with intent to commit larceny or of the included offense of unlawful entry, and should also not be convinced beyond a reasonable doubt that the accused is guilty of larceny or of the lesser included offense of wrongful appropriation, then the court must find the accused not guilty."

The court closed again for deliberation on its findings. Once more it called in the law officer and reporter and informed the law officer of the form of its findings. The law officer approved the form and, with the reporter, withdrew from the closed session. The court was then opened and the president announced the court's findings as follows:

"PRESIDENT: Sgt London, it is my duty as president of this court to inform you that the court in closed session and upon secret written ballot, two-thirds of the members present at the time the vote was taken concurring in each finding of guilty, finds you:

Of the specification to Charge I: Not Guilty, and to Charge I: Not Guilty.

Of the specification to Charge II: Guilty, and of Charge II: Guilty."

Appellant now contends that the action of the law officer improperly compelled the court to reconsider a finding of not guilty on the larceny count (Charge II and its Specification). He argues that the closed session announcement of the proposed findings to the law officer amounted to a finding of not guilty. He rejects as mere surplusage, the court's finding that the accused was found guilty of being an accessory after the fact in violation of Article 78, 50 USC § 672, but emphasizes the acquittal part of the court's finding as correct and conclusive.

Preliminary to consideration of the main problem is the question of whether the law officer's instructions that an accessory after the fact is not a lesser included offense of the substantive offense is correct. If it is a lesser included offense, the law officer's instruction was error and corrective action would be required. Under certain conditions, the acts of a principal to a substantive offense and those of an accessory after the fact may properly be charged as a single continuous criminal transaction. See Skelly v. United States, 76 F2d 483 (CA10th Cir 1935), cert den 295 US 757, 79 L ed 1699, 55 S Ct 914. However, the general rule is that the offense of an accessory after the fact is a crime separate from that of the substantive offense. State v. McAlister, 139 Kan 672, 33 P2d 314. See also: People v. Galbo, 218 NY 283, 112 NE 1041. The form of the specification here makes the general rule applicable. Accordingly, we hold that the law officer's instruction was legally correct.

Turning to the effect of the announcement of the court's findings to the law officer in closed session, we note that the practice apparently has no identical counterpart in civil jurisdictions. Cf. Rule 31, Federal Rules of Criminal Procedure; New York Code of Criminal Procedure, §§ 450, 451. In the latter, the jury normally announces its verdict orally in open court or submits a written statement of its findings to the judge; the verdict is then formally recorded. Although the procedure is somewhat dif-

ferent, the principles which govern civilian courts may properly be applied to courts-martial to the extent that they are not in conflict or out of harmony with military law and requirements. See United States v. Clay, 1 USCMA 74, 1 CMR 74. A review of the civilian authorities convinces us that the court's reconsideration of its findings was not improper.

The court was properly instructed that an accessory after the fact was not a lesser included offense to those charged. Therefore it could not legally return a finding of guilty thereon. When it attempted to do so in spite of the instructions, it was acting illegally. The law officer could then properly require the court to reconsider its finding. The applicable rule is stated in Abbotts Criminal Trial Practice, 4th ed, § 740, page 1386, as follows:

"§ 740. Power of Court to Require Jury to Correct Verdict.—Before a verdict, whether oral or sealed, is recorded, and the jury have been dismissed from their relation as such to the case, the court has power to require them to reconsider their verdict, not merely to correct a mistake in form or make that plain which is obscure, but to supply what is wanting, or alter it in substance, if they so agree. This may be done with or without the consent of counsel.

"If the verdict returned by the jury finds the accused guilty of a crime for which he cannot be convicted, or it appears that the verdict is not in fact the verdict which the jury intended to return, or that it is irresponsive, or unintelligible, or legally absurd, or defective, or to fix the punishment the court may before the verdict is recorded, direct the jury to amend it."

In Commonwealth v. Micuso, 273 Pa 474, 117 Atl 211, the Supreme Court of Pennsylvania had before it a situation substantially similar to the one here. In that case, the defendant was indicted for murder. Under the indictment and the evidence, the accused could not legally be convicted of involuntary manslaughter. Nonetheless, the jury handed up to the trial judge a written verdict of guilty of involuntary manslaughter. The judge rejected the verdict and further instructed the jury. It again retired, and then returned with a finding of guilty of voluntary manslaughter. This verdict was accepted and recorded. In holding this action proper, the court said:

"The jury, after due deliberation, came in and handed up a written verdict of guilty of involuntary manslaughter; whereupon the trial judge informed them that, under the indictment, no conviction could be had for such offense, but said if they had mistakenly written 'involuntary' for 'voluntary' they could retire to correct it. This they did and rendered a verdict accordingly, which was properly recorded. The verdict is what is announced in open court and recorded as such; not what was written and handed to the trial judge; and, until so announced and recorded, the jury may correct any mistake inadvertently made therein, and the court may request them to retire for that purpose."

We think it not unreasonable to equate, in a general way, the handing up of a written verdict to the trial judge prior to its announcement in open court to the submission of the proposed finding to the law officer in closed session. If it is proper for the judge to refuse to accept the first verdict because it is incorrect and to require the jury to reconsider, we regard it as equally proper for the law officer to refuse to take action on a proposed illegal finding and to have the court open for further instructions in the presence of accused and his counsel. Thus, unless provisions of the Uniform Code or the Manual provide a procedure different from that prevailing in the civilian courts, the law officer's conduct was scrupulously proper.

The provisions of the Uniform Code of Military Justice and the Manual, which bear upon the issue are few in number and brief in content. Under Article 53, 50 USC § 628, a court-martial is required to announce its findings as soon as determined. This requirement is supplemented by the Manual

provisions covering the procedure for reaching a finding. In part, those provisions read as follows:

". . . A finding of not guilty results ' as to any specification or charge if no other valid finding is reached thereon; however a court may reconsider any finding before the same is formally announced in open court. The court may also reconsider any finding of guilty on its own motion at any time before it has first announced the sentence in the case."

From these provisions it appears that a finding on the guilt or innocence of the accused is not final ██ until it is formally and correctly announced in open court. In that respect, the military practice approximates that prevailing in the Federal and state criminal courts. There, finality of finding is achieved on the recordation of the verdict after it has been announced. See Rule 31, Federal Rules of Criminal Procedure; Jay v. United States, 35 F2d 553 (CA10th Cir 1929); Anderson v. United States, 294 Fed 593 (CA2d Cir 1923); Commonwealth v. Micuso, supra. Consequently, we have no doubt that, had the court followed the same procedure it did, but without calling the law officer into its closed session to assist it with the form of the findings, the appellant would have no basis for any claim that he had been acquitted. The crux of the issue then is the effect of the announcement of the proposed findings to the law officer in the closed session.

The appellant contends that the announcement of the court's finding to the law officer in closed session ██ is the same as its announcement of the findings in open court. He seeks support for this claim in the provision of Article 39, 50 USC § 614, that a law officer may be called into the closed session only after the court has "finally voted on the findings." From this, he reasons that the calling in of the law officer is a clear indication of the finality of the court's finding which cannot thereafter be changed from an acquittal to a conviction. In further support of his position,

the appellant relies heavily upon the following excerpt from the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, pages 76–77:

"*Form of finding*. The provision of Article 39 that the law officer and the reporter may be called before the court for the purpose of putting the findings in proper form is new. Any discussion between the court and the law officer at this time is to be recorded verbatim. The law officer should put the findings in proper form in any case in which findings by exceptions and substitutions are made. If, after conferring with the president, the law officer is in doubt as to what offense the court intended to find, he should give it proper instructions, and advise the court to close and reconsider its findings, and to make a new finding that is not ambiguous. However, if there is a clear indication that the court has found the accused not guilty of a particular offense, it cannot thereafter, under the guise of clarifying an ambiguous finding, find the accused guilty of that offense."

We can readily agree with the appellant's extract from the Legal and Legislative Basis, supra, without reaching the conclusion he draws from it. Certainly, if a court formally and correctly announced a finding of not guilty in open court, it could not thereafter reconsider its finding and return a finding of guilty. Such reconsideration would clearly be in violation of the provisions of paragraph 74d(3), Manual for Courts-Martial, United States, 1951. However, the court here did not formally announce its findings in open court. And, the Legal and Legislative Basis does not suggest that the announcement of the proposed findings to the law officer in closed session has the same irrevocable effect as an announcement in open court. True, the first part of the extract is concerned with a closed session appearance of the law officer, but it plainly appears that its concluding portion relates to disclosure of the findings in open court. Why else would the law officer "advise the court to close" and reconsider its finding? Moreover, if the law officer assumed to instruct

the court in the closed session on other than the form of its finding, reversible error would result. United States v. Gladden, 2 USCMA 262, 8 CMR 62. Hence, if the Legal and Legislative Basis is to be considered in the solution of the present problem, it sustains rather than disproves the practice of further instruction when it appears that a court's initial findings are improper.

Similarly, Article 39, supra, furnishes no support for the appellant. The applicable portion of that Article reads as follows:

". . . After a general court-martial has finally voted on the findings, the court may request the law officer and the reporter to appear before the court to put the findings in proper form, and such proceedings shall be on the record."

This provision is one of several which transformed the law member of the court-martial into the law officer. Article 39, in conjunction with the other Articles, changed the court-martial organization to conform more nearly with its civilian counterpart. See United States v. Keith, 1 USCMA 493, 4 CMR 85. Some differences between the military and the civilian procedures remain. One of these is that preliminary advice on the form of the finding may be given to the court in closed session. This provision is intended to eliminate illegal, irregular, confused, or ambiguous findings by the court prior to its announcement in open court. It is only slightly different from the handing of the written verdict of the jury to the trial judge for his examination before it is recorded. See Jay v. United States, supra; Commonwealth v. Micuso, supra. We do not think that Congress intended by Article 39 to preclude the court from any reconsideration of its findings before they are formally announced in open court. The final vote referred to in Article 39 is only the finality required to put into the proper form whatever findings have been reached up to that point. It is not a final vote from the standpoint of irrevocable decision. That such is the intent of the Article appears from a simple example.

Let us suppose the court had called in the law officer and announced to him that it had found the accused not guilty on both charges. The law officer approved the findings as to form and retired from the closed session with the reporter. The court then opened and the president announced that the accused was not guilty of Charge I but guilty of Charge II. The law officer, having been informed in the closed session of a finding of not guilty of both offenses, doubts the correctness of the verdict and questions the president as to whether the findings are as announced. The president insists that they are. And, in fact, they are as announced, because after the law officer had retired from the closed session, the court, at the request of one of the members, reconsidered the findings. These new findings are those announced by the president. Defense counsel, suspecting some errors, asks that the court be polled. Without passing in any way on the validity of such a request, we assume, for the purpose of our illustration, that the request is granted. The court is polled and each member specifically says that he voted for the findings as they were announced by the president. Under these circumstances, we think that it could not be seriously contended that announcement of the first proposed findings to the law officer in the closed session amounted to an acquittal of the accused on both charges. If there is no finality attached to disclosure of the proposed findings to the law officer in closed session under one set of circumstances, there is a like lack of finality in the situation in this case. The only findings that can have legal effect are those formally and correctly announced in open court. Those are the only ones communicated to the accused, and we believe that they are the only ones by which he is bound.

A further point requires mention before we conclude this opinion. Appellant contends that the action of the law officer, in reinstructing the court on the findings it might properly make, constituted a coercion of the verdict. If there was a fair risk that the court was misled, we would unhesitatingly reverse the findings of guilty. However, there

is nothing in the content or the form of the additional instructions which can reasonably be construed as coercing the court to return a finding of guilt. They were virtually the same as the original instructions, and they left the question of the guilt or innocence of the accused entirely up to the court. Of significance too, is the fact that they contained no direct or implied expression of opinion by the law officer of the guilt or innocence of the accused. They constituted a correct statement of the law, and, as we have already pointed out, they were required by the circumstances.

For the foregoing reasons, the decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (concurring in the result):

After the resolution of some doubts, I am able to concur with my brothers in their disposition of this case.

My chief concern has been with the language of the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, cited in the principal opinion. Perhaps the spokesman for the Court is correct in concluding that the earlier portion of the quoted phrasing deals with "a closed session appearance of the law officer," whereas the latter "relates to a disclosure of the findings in open court." Indeed, the section under scrutiny is open to this interpretation, but it is also distinctly subject to a different one—which I see no point in laboring here.

At best, it is inartfully phrased and thoroughly confusing—so much so that I would prefer to leave it out of account, and to rely solely on the provisions of the Code and the Manual, together with the apt analogies from civilian law presented by the author of the principal opinion. When I do this, I am convinced of the soundness of our conclusion. This may be thought to accord a cavalier treatment to the Legal and Legislative Basis. However, I see little else to do when I can find no sort of firm guidance in its obscure terms.