Froessel, J.
Defendant was convicted of murder in the first degree, and, upon the jury’s recommendation, sentenced to life imprisonment. The evidence adduced at the trial may be summarized as follows:
At 11:30 on the morning of July 3,1959, Carmello Finocchiaro was discovered lying on the ground floor of 661 Broadway, Brooklyn, New York. Upon the arrival of the police, Finocchiaro was found near the elevator, bleeding profusely from head wounds, and incoherent. He died in the hospital the following day. The cause of death was 1 ‘ a fractured skull, subdural and epidural hemorrhage ’ ’.
On July 14 Detective Edward O’Connor, in charge of the investigation, went to Saver’s Pawnshop, and found a Longine Wittnauer wrist watch which had been pawned on July 3, 1959, together with an application for a $10 loan signed by “ Charles Brown”. At the trial, decedent’s daughter testified that she had seen her father wearing such a wrist watch when he left home the morning of July 3. It was also established that in January, 1958 decedent’s watch had been repaired by Anthony Jewelers, and that the case number thereon corresponded to the number on the watch pledged at Saver’s Pawnshop. The signature on the loan application was in the same handwriting as the indorsement on a payroll check, payable to a former employee of decedent, one “Charles Everett”; O’Connor received this check from decedent’s son on July 15.
*504 At 10:30 p.m. on July 15, Detective O’Connor approached defendant in front of 226 Bainbridge Street, where the latter was living with Mrs. Brown. When asked if his name was Charles Everett, defendant replied it was Charley Brown. 0 ’Connor said: ‘£ Don’t kid me, I know you’re Charles Everett. 1 have a warrant from Domestic Relations Court. Your kids are hungry; your wife left your kids ’ ’, to which defendant responded ££ Hell, no.” The detective in fact had no warrant.
O’Connor and defendant thereupon went upstairs to the latter’s apartment, where O’Connor telephoned Brooklyn East headquarters and asked someone in the homicide squad to send an automobile. Two detectives called for O’Connor and defendant, and, after stopping for a few minutes at said headquarters, they drove to the 87th Precinct, arriving between 11:30 and midnight. In due course they were joined by four other police officers, who were interested in the investigation.
Defendant was taken into the commanding officer’s room, where he was questioned by O’Connor and Detective Bulger, the latter asking only a few questions. O’Connor testified that when he showed defendant the loan application, the latter admitted the signature ££ Charles Brown ” was his, but stated that he won the watch “in a crap game” on July 1, 1959. Defendant was unable to recall the names of the other participants. When shown the payroll check, defendant stated that it contained his signature, and that he had worked for Finocchiaro two or three years before.
O’Connor then told defendant that the watch and $80 had been taken from Finocchiaro, who had been hit on the head in a hallway at 661 Broadway on July 3; that Finocchiaro was not badly hurt and was at that moment downstairs; that O’Connor could control Finocchiaro; and that he would help defendant if the latter told the truth. When defendant denied having assaulted Finocchiaro, O’Connor left the room, telling defendant that he would speak to Finocchiaro. Five minutes later 0 ’Connor returned and told defendant that Finocchiaro had said defendant had assaulted him. Defendant said ££ All right, I’ll tell the truth.” Defendant then admitted having robbed and assaulted Finocchiaro.
The substance of defendant’s admissions to O’Connor and of a statement made by defendant to an Assistant District Attorney *505 at 7:37 a.m., recorded by a stenographer, is as follows: On the morning of July 3, 1959 defendant went to Finocchiaro’s shop at 661 Broadway, and asked Finocchiaro whether there was any work. On his way downstairs, after having been told there were no jobs, defendant conceived the plan to rob his former employer. He went outside, picked up a stick approximately 18 to 24 inches long and 2 inches thick, returned to the building and, when he saw Finocchiaro through the elevator window, hid behind the elevator door. When Finocchiaro stepped from the elevator, defendant struck him with the stick on the left side of his head. As Finocchiaro fell he looked up; defendant, afraid that he had been recognized, struck him again. Defendant took the wrist watch and a wallet, left the building, and deposited the stick in a garbage can. On his way to the subway, defendant, after removing $80, threw the wallet in a garbage can. He then went to Saver’s Pawnshop and pawned the watch for $10.
According to O’Connor, the entire interrogation of defendant with regard to Finocchiaro lasted at most an hour and 15 minutes; the testimony is conflicting on this point, however, there being an indication that defendant was questioned about other matters after he admitted having robbed Finocchiaro.
In response to a hypothetical question, the assistant medical examiner who performed the autopsy on decedent’s body testified that in his opinion a piece of wood, 18 to 24 inches long and 2 inches thick, if applied with sufficient force to the skull of an individual, either one time or repeated times, could produce the type of fracture of the skull, with subdural and epidural hemorrhages, that was found to be the cause of Finocchiaro’s death.
Two witnesses, one 14 years of age, testified to having seen defendant at 661 Broadway on July 3; the one stating, however, he “ saw a man that looks like ” defendant; the other, who saw defendant twice that morning, admitting he “just got a quick look ”.
Testifying in his own behalf, defendant stated that on June 26, 1959 he had been successful during a card game, and had received the Wittnauer watch as security for a $10 loan he had made to another player, whom he did not identify. Defense witnesses, who testified that defendant played cards on June 26. *506 did not refer to the wrist watch. Defendant further stated that at 11:00 a.m. on July 3 he gave his landlord $18 rent, after which he went to Saver’s and pawned the watch. On rebuttal, however, the landlord testified that defendant had paid the rent sometime during the afternoon of July 3 and not at 11:00 a.m. Defendant denied having committed the crime, and stated that what he had told the detectives and the Assistant District Attorney was not the truth. He claimed the admissions and statement had been obtained from him as the result of severe beatings.
All six detectives testified that defendant was not beaten. The Assistant District Attorney, who had taken defendant’s statement, testified that he had received no complaint from defendant, and had observed no mark of violence on the exposed parts of defendant’s body. Defendant made no complaint to the Magistrate who arraigned him on July 16, or to the officer in charge of the felony court pen. The jail physician, who examined defendant the same day, noted on the medical card that defendant’s general condition was “ good ”, and that there was ‘1 evidence or diagnosis of abrasion right shin bone, wrists appear normal ”. The doctor testified that defendant made no other complaint.
Over defendant’s objection that they were “ coerced and the result of the beatings which he got ’ ’, the trial court received in evidence his admissions to Detective O’Connor and his subsequent confession. At the close of the voir dire, and again in his charge, the court carefully instructed the jury that the police officers’ denials of the alleged coercion presented a question of fact for their ultimate determination. The jury was expressly instructed that it was the duty of the prosecutor to prove that the confession had been freely given, and that if they found it was not voluntary, or if they had a reasonable doubt as to whether it was voluntary, they were to disregard it. In addition, the court charged that unreasonable delay, if such was found, was a circumstance to be considered by the jury on the question of voluntariness. The conflict in the testimony raised a question of fact which the jury resolved against defendant. The Appellate Division affirmed, and we have no right to disturb the finding of voluntariness implicit in the verdict.
Defendant contends, however, that, “ Laying aside any question of police brutality ”, the “ illegal arrest and fraud which *507 produced defendant’s confession required its exclusion” as a matter of law.
The alleged illegality of the arrest is predicated on 0 ’Connor’s failure to comply with section 180 of the Code of Criminal Procedure. Whether defendant’s detention was illegal or whether, as the People maintain, when he was first taken to the police station for investigation he was not placed under arrest, the result is the same. The fact that admissions or a confession are obtained from a defendant during a period of illegal detention following an unlawful arrest does not, as a matter of law, render them inadmissible (Stein v. New York, 346 U. S. 156, 186-187; People v. Alex, 265 N. Y. 192, 194; People v. Mummiani, 258 N. Y. 394, 396; People v. Trybus, 219 N. Y. 18, 22; Balbo v. People, 80 N. Y. 484, 499). We recently reaffirmed this well-settled principle in People v. Lane (10 N Y 2d 347). The manner of the arrest and the subsequent detention are merely circumstances to be considered by the jury on the issue of voluntariness.
Likewise, defendant’s claim that the deception practiced by O’Connor renders his confession inadmissible must fall under the well-settled law of this State. Almost a century ago, Chief Judge Davies stated that “ a confession is admissible, although it is * * * obtained by artifice or deception ” (People v. Wentz, 37 N. Y. 303, 306). This rule has been reaffirmed by our court in People v. Buffom (214 N. Y. 53, 57); People v. White (176 N. Y. 331, 348-349). (See, also, United States ex rel. Caminito v. Murphy, 222 F. 2d 698, cert. den. 350 U. S. 896; State v. Exum, 213 N. C. 16; Commonwealth v. Johnson, 372 Pa. 266, cert, den. 345 U. S. 959; 3 Wigmore, Evidence, § 841.) Deception alone will not render a confession invalid, unless the deceiving acts amount to a deprivation of due process (People v. Leyra, 302 N. Y. 353, 363). Defendant’s reliance upon the Leyra case is misplaced, for in that case we found (p. 365) “ a deliberate attempt to extract a confession through the ceaseless pressure of a skillful psychiatrist by his peculiar technique, claiming to be defendant’s doctor, promising to help him, giving assurances and at the same time conducting an unrelenting interrogation of the exhausted accused.” We held the confession obtained by these means to be involuntary as a matter of law.
The instant case, however, presents no such aggravating circumstances as would transform the deception practiced upon *508 defendant by Detective O’Connor into a denial of due process. The admissions, although obtained following deception, could nevertheless be found to have been voluntarily made in the hope of securing O’Connor’s intercession with Finocchiaro. Since they were freely given and were not the product of physical or mental coercion, they could be used against him (Culombe v. Connecticut, 367 U. S. 568, 602). No objection was made to the admissibility of the confession on the ground that it was procured by fraud. The court below properly charged the jury in this respect, and no exception thereto was taken.
We have examined the remainder of defendant’s contentions and find them to be without merit or not saved for review. With one exception, they require no comment. The exception relates to the trial court’s charge with respect to the inference which might be drawn from proof of recent and exclusive possession of the fruits of a crime. In this connection the court charged, virtually in the language employed by Judge Cardozo in People v. Galbo (218 N. Y. 283, 290): “ The Court of Appeals has stated that recent and exclusive possession of the fruits of a crime, if unexplained or if falsely explained, will justify the inference by a jury that the accused is the criminal. ” The court continued by instructing the jury that they were not bound to draw such an inference, but “ may reject it, as you see fit”. The court then proceeded to marshal the evidence in this respect and, after so doing, stated:
“If you find [defendant’s] testimony to be truthful and, gentlemen, you are the judges of the facts in this case, then he has explained his possession. He has met the requirements of the law on this point.
“ On the other hand, if you find that [defendant] did not explain his recent possession of the alleged stolen watch or that the explanation he gave was false, then under the law you do not have to, but you may draw an inference of the commission of a larceny by the defendant. ’ ’
On this point, defendant relies on the dissenting opinion below, which stated that the court should have charged the jury that they had to decide whether defendant was the thief or merely a receiver of stolen goods, because “ as soon as evidence is offered that the theft was committed by someone else, the inference changes, and [defendant] becomes a receiver of stolen *509 goods ” (People v. Galbo, supra, p. 291). The dissenter felt that “ defendant’s version had shifted the inference covered in the charge ”, so that the burden remained upon the People to prove defendant was the thief who had murdered decedent.
It is clear that the court’s charge that recent possession, if unexplained or falsely explained, justifies the “ inference of the commission of a larceny by the defendant ’ ’ was correct. This, as noted, is but a restatement of the language in People v. Galbo (supra) which has become the well-established law of this State. Moreover, in People v. Spivak (237 N. Y. 460, 461), where the defendant was indicted for larceny and receiving stolen property following his sale of an automobile which had been stolen a few days earlier, Judge Oakdozo, on the authority of the Galbo case, stated: “The defendant, having made the sale, should have explained the origin of his possession.” It was therefore not error to have required of defendant an explanation of how the watch came into his possession. There was ample evidence from which the jury could have concluded that defendant’s explanation was false; they were therefore entitled to reject the proffered explanation and draw the inference that defendant was the thief.
Upon the record before us and in the setting of this case, it was impossible for the inference to have changed so as to make defendant a mere receiver, and it was thus unnecessary for the court to charge the jury that they might find defendant to be a receiver. The inference resulting from proof of recent possession of the fruits of a crime does not change until “ evidence is offered that the theft was committed by someone else ” (People v. Galbo, supra). Here, the only evidence which might possibly have supported an inference that the theft was committed by someone else was defendant’s explanation that he acquired the watch in a card game a week before the alleged larceny. If the jury were to have credited this explanation, defendant would not have been the thief who stole the watch or a receiver of stolen property, for he allegedly came by it innocently. On the other hand, if the jury had rejected defendant’s version, there would have been eliminated from the case the sole evidence which could possibly have supported the inference that the theft had been committed by someone else, and the only inference which might have been drawn — although it need not have *510 been—was that defendant was the thief. In either event, there simply was no issue in this case as to receiving solen property.
The judgment of conviction should be affirmed.