THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SAMIR ZADA, Appellant.

Second Department, June 2, 1980

## APPEARANCES OF COUNSEL

*Zanazzi & Gardella (Richard M. Gardella* of counsel), for appellant.

*Kenneth Gribetz, District Attorney (James H. Mellion* of counsel), for respondent.

## OPINION OF THE COURT

*Per Curiam.*

The defendant appeals from a judgment convicting him,

upon a jury verdict, *inter alia,* of intentional and felony murder and robbery in the first degree. For the reasons which follow, the judgment must be reversed and a new trial ordered.

On July 29, 1973 the body of Byron G. Stout, II, was found on the floor of the bedroom of his apartment in Spring Valley. For at least two years immediately prior to his death, Stout constantly wore a certain ring.

An autopsy was performed July 30, 1973. Three bullets were removed from the victim's head. The cause of death was destruction of the brain due to the bullets, with resultant cardiac and respiratory arrest. The Rockland County Chief Medical Examiner was of the opinion that Stout had died three to five days before July 29, 1973.

On July 27, 1973 the defendant, Samir Zada, entered an antique jewelry store in Nyack and—using the name Billy Smith and a false address—sold the subject ring. The manager recalled that defendant was a "local person" who "used to hang around the block and was in the neighborhood quite often." On April 27, 1973 defendant—using the name Billy Jackson and a false address—had sold the manager a watch.

The defendant was arrested on August 2, 1973. On August 30, 1973 an indictment was filed in the County Court of Rockland County, alleging that defendant, while acting in concert with Raphael Cortez, intentionally murdered Byron G. Stout, II; that he caused the death of Mr. Stout during the commission of and during the immediate flight from the crimes of robbery in the first degree (two counts), robbery in the second degree, burglary in the first degree (two counts), and burglary in the second degree; and that he took property from Mr. Stout, thereby committing the crimes of robbery in the first degree (two counts), robbery in the second degree, burglary in the first degree (two counts), burglary in the second degree and grand larceny in the third degree.

A change of venue was ordered and the indictment was transferred to the County Court, Putnam County, where the case was tried.

Shortly before the trial Cortez pleaded guilty to manslaughter in the first degree. He did not appear at the trial, but the fact of his guilty plea was conveyed to the jurors at the request of defense counsel.

At the trial, the prosecution's case was built around the

testimony of two accomplices, William Chester Swann and Frederick Gensel, Jr. They described the events that took place in Stout's apartment on the fatal night, July 24-25, 1973, and defendant's conduct before, during and after the commission of the crimes in Stout's apartment. They testified that defendant's motive was to obtain Stout's ring and that prior to the crime defendant had boasted that if he had to he would cut off Stout's finger to get the ring.

On direct examination, Swann testified that during his lifetime he had used "assorted drugs". On cross-examination defense counsel elicited some details: the witness started using heroin in 1971 but claimed that he could "stop any time", and had stopped at that time (May, 1974). The last time he had heroin was a month or two before the trial, at which time his habit was two to three $5 bags per day. In July, 1973, before the subject murder, the witness was using heroin "occasionally", three to five $5 bags per day, and "once or twice" sold drugs to keep up his habit. He denied using 15 to 20 bags a day—although he admitted that on August 5, 1973, after he was taken into custody herein, he falsely told a doctor at Summit Park Hospital that he was having withdrawal symptoms and that his habit is 15 or 20 bags per day. As a result of that statement, he was given methadone. On redirect, he testified that the purpose of the lie was to get something to calm his nerves.

Cross-examination of Gensel elicited that in July, 1973 Gensel was snorting heroin, but "not very often". He also had used LSD and marihuana. At that time he was selling heroin with Swann. Gensel testified that they were "dealing" with defendant.

Defendant testified that he did not shoot or kill Stout; that he had never been inside Stout's apartment; and that he had not committed any of the crimes charged in the 14-count indictment. He claimed that he was at a house party in New City or Nanuet on the night of July 24-25, 1973. He admitted selling the ring but claimed that he had not known it was Stout's ring. He testified that the ring had been given to him by Swann in payment of a debt arising out of a transaction in which Swann got "beat out of" money given him by defendant for drug purchases and sales. In prior heroin deals, Swann had made profits for defendant with defendant's money.

In his opening statement, in the elicitation of evidence during the trial, and in his summation, the prosecutor repeat-

edly emphasized and forcefully hammered home the ring motive and the fact that on July 27, 1973 defendant was in possession of and sold the deceased's ring. The theme was stated as follows in the prosecutor's opening: "Zada expressed and you'll hear this, his insatiable desire to obtain by any means a ring owned by Mr. Stout and you'll hear the shocking and unbelievable extent to which Zada indicated he would go in order to forcibly steal Mr. Stout's ring; which he believed at the time to be of immense value."

The case presented the vital question of the permissible inferences that might be drawn from the evidence that after the deceased had been killed defendant possessed and sold the deceased's ring. Did this evidence warrant the inference that defendant had participated in the murder and robbery of the deceased, or merely that defendant was a receiver of the stolen ring?

The Trial Judge charged the jury as follows: "Now, a word on recent and unexplained possession of fruits of a crime and you recall testimony here that the ring, Zada testified that he had this ring and he told you how he had come by this ring when he sold it to the jeweler and so forth and now, if you believe the other testimony of the other witnesses, Mr. Swann, Mr. Gensel and some of those people as to where this ring came from, you believe the testimony of the people, the nephew and the aunt of the deceased that this was the deceased's ring then you come to the question of what is the law as to recent and unexplained possession of fruits of a crime and now, the first thing obviously is for you to determine, what weight or effect you'll give the testimony of the various witnesses. You have got to weigh the testimony and determine as I said, whom you are going to believe and so on and so forth and, secondly, whether the possession by the defendant of one or more of the items of the deceased has been proven beyond a reasonable doubt, naturally of the possession of the ring and I think that the defendant admitted himself on the stand but your recollection will serve you better than mine will but you have to find that the possession of the ring by the defendant, if you find it to be so an item of the deceased, whether or not that has been proven beyond a reasonable doubt because as I have told you, you can't base an inference on an inference, it must be based upon facts proven beyond a reasonable doubt.

"Now, I think one of our leading justices who in this state

set forth the rules concerning recent possession, recent and unexplained possession of fruits of a crime, Mr. Justice Cordoza *[sic]* in People against Gallo *[sic]* 218, N.Y. 283 and in that decision he said that the law in this state is clear that *recent and exclusive possession of the fruits of crime if unexplained or if falsely explained will justify an inference that the possessor is the criminal.* It is not an inference of law but one of fact and as such before you can draw such an inference and give it evidentiary weight or value, you must apply the legal test and requirement that I have just given you under the circumstantial evidence charge, that it is not part of this. You as the triers of the fact must determine whether the facts testified to have the legal weight and quality to shape the inference or whether other facts neutralize or repeal it or render it so remote or tenuous or uncertain that the inference must be rejected." (Emphasis supplied.)

Defendant's trial counsel failed to object or except to the above charge. However, we find that the above charge is erroneous and highly prejudicial (see *People v Galbo,* 218 NY 283; *People v Batten,* 40 AD2d 549, affd 31 NY2d 737) and of such fundamental nature that we take cognizance of it in the interest of justice (see *People v Amoroso,* 38 AD2d 563). The same error was committed in the above charge as was committed in *People v Batten (supra)* and, as in *Batten,* the judgment of conviction must be reversed and a new trial ordered. In *Batten* we held (pp 550-551): "The prosecution relied on the inference which a jury may draw from the recent unexplained, or falsely explained, possession of the fruits of a crime as justifying the inference that Batten had committed the robbery during which the three butchers were killed (see *People v. Galbo,* 218 N.Y. 283). The trial court charged that the jury was not required to draw a guilty inference from the recent, falsely explained, possession of the stolen money. The court charged: 'The question is for you to determine. Do the acts of possession and concealment of the money stamp the defendant as the culprit or does the explanation that he offered satisfy you that the indicated possession of the money was an innocent one? If you have a reasonable doubt concerning that, you should resolve that doubt in the defendant's favor. *On the other hand, if* you are convinced from all the facts and the circumstances that the recent and exclusive *possession of the money and the subsequent hiding* and concealment of it *was a guilty one* and if you are satisfied beyond

a reasonable doubt of that fact, you would be *justified in inferring that he is guilty'* [italics supplied]. From all that preceded it, the court clearly meant that the jury, if it found defendant's possession and hiding of stolen money justified a guilty inference, would at that point be justified in returning a verdict of guilty of murder in the first degree or one of its lesser included offenses. This was grave error. The trial court should have instructed the jury that, if they concluded that a guilty inference was warranted, then they must determine whether the facts point to Batten as a knowing receiver and possessor of stolen goods or as a participant involved in the robbery itself. As Judge CARDOZO so aptly phrased it in *People v. Galbo (supra,* p. 290): 'Only half the problem, however, has been solved when guilty possession fixes the identity of the offender. *There remains the question of the nature of his offense.* Here again the facts must shape the inference. Is the guilty possessor the thief, or is he a receiver of stolen goods?' [Italics supplied.] The trial court in this case completely overlooked in its charge that Batten could have been guilty of a knowing receipt, possession and concealment of the stolen money, without having participated in the robbery resulting in the murders. In short, there were two guilty inferences which the jury could have drawn under the circumstances. Defendant could have been involved in the robbery which resulted in the death of three men, or he could have merely been a knowing possessor and receiver of stolen money. Of course, since the inference of guilt from such possession is one of fact and not of law, it need not be drawn at all by the jury. The facts in this case, if defendant's statements to the police were to be believed, point to guilt of possession of stolen money as a receiver. The trial court, however, in effect charged that there was only one guilty inference which could be drawn from the facts and, if the jury concluded defendant's possession was essentially illegal, they could find defendant guilty of murder in the first degree. This erroneous charge alone requires reversal."

In a dissenting memorandum, the late Mr. Justice BENJA-MIN stated, *inter alia:* "I see no reversible error in this record. The charge on recent possession of the fruits of the crime was substantially correct, since, if the jury disbelieved defendant's story as to how he had obtained the money, the only possible inference was that he had obtained it during the commission of the robbery and murder (see *People v. Everett,* 10 N Y 2d

500, 508-510). Moreover, the charge on that point clearly was not harmful to defendant, as it instructed the jury to find *innocent* possession of the stolen money, if it believed defendant's story, even though his testimony showed at best a guilty possession of stolen goods. Additionally, a charge that the jury could find defendant guilty of criminal possession of stolen goods would have been erroneous in this case, as that offense was not charged in the indictment and it is not a lesser included offense of the charge of murder in the first degree. In short, then, there was no reversible error in the charge." *(People v Batten,* 40 AD2d 549, 551, *supra.)*

The Court of Appeals affirmed *Batten* (31 NY2d 737) on the opinion at the Appellate Division.

In conclusion, at bar the erroneous charge prejudiced the defendant and critically infected the evidence presented by the prosecution to corroborate the testimony of the accomplices and to link defendant to the subject crimes.

We have examined all of defendant's other points, but find no further or additional grounds for reversal.

HOPKINS, J. P., DAMIANI, TITONE and MANGANO, JJ., concur.

Judgment of the County Court, Putnam County, rendered June 26, 1974, reversed, as a matter of discretion in the interest of justice, and new trial ordered.