# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40193 (reh)**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Colin R. COVITZ**
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 March 2025

———————————

*Military Judge*: Lance R. Smith (arraignment and pretrial motions); Matthew P. Stoffel.

*Sentence*: Sentence adjudged 12 July 2023 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 18 September 2023: confinement for 5 months and forfeiture of $925.00 pay per month for 5 months.

*For Appellant*: Major Matthew L. Blyth, USAF.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel J. Pete Ferrell, USAF; Major Lecia E. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and PERCLE, *Appellate Military Judges*.

Judge PERCLE delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge DOUGLAS joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

PERCLE, Judge:

This case comes before us a second time. At Appellant's first trial, a general court-martial composed of officer members convicted Appellant, contrary to his pleas, of four specifications of domestic violence, in violation of Article 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928b.[1,2] *See United States v. Covitz*, No. ACM 40193, 2022 CCA LEXIS 563, at *1 (A.F. Ct. Crim. App. 30 Sep. 2022) (unpub. op.). The adjudged and approved sentence consisted of a dismissal, confinement for eight months, and forfeiture of all pay and allowances. *Id.* On appeal, this court set aside the findings and the sentence and authorized a rehearing because we concluded the military judge erred by denying challenges for cause against multiple court-martial panel members. *Id.* at *40.

On 17 January 2023, one charge and four specifications of violation of Article 128b, UCMJ, were re-referred to a new trial by general court-martial. On 12 July 2023, at Creech Air Force Base (AFB), Nevada, a military judge sitting as a general court-martial found Appellant guilty, contrary to his pleas, of Specifications 1 and 4 of the Charge. The military judge sentenced Appellant to five months' confinement, forfeiture of $6,127.00 pay per month for five months, and a reprimand. On 22 July 2023, Appellant submitted a clemency request asking the convening authority to "reduce [Appellant's] adjudged forfeitures of $6,127.00 pay per month for 5 months . . . by 94 days" in accordance with Rule for Courts-Martial (R.C.M.) 305(k), considering Appellant's previously served and set aside confinement of eight months. Additionally, Appellant requested that the convening authority suspend any remaining forfeitures after the requested reductions, if any.

On 28 August 2023, the convening authority took no action on the findings but granted in part Appellant's request to reduce the adjudged forfeitures. In his decision on action memorandum, the convening authority reduced the adjudged forfeitures to $925.00 pay per month for five months. The convening authority also disapproved Appellant's adjudged reprimand. On 18 September 2023, the military judge signed an entry of judgment (EoJ) and entered the sentence.[3]

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was charged with five specifications of domestic violence in violation of Article 128b, UCMJ, and was acquitted of one of those specifications.

[3] Although the entered sentence is below the jurisdictional threshold of this court applicable to Appellant during his original court-martial, this court retains jurisdiction

On 18 July 2024, Appellant filed with this court his assignments of error. Appellant asserts six issues which we have reworded: (1) whether Appellant's conviction for domestic violence is factually sufficient; (2) whether the record of trial's omission of the arraignment audio requires relief, or, at a minimum, remand for correction; (3) whether Appellant is entitled to sentence relief because of the 155-day delay between announcement of sentence and docketing with this court; (4) whether, as applied to Appellant, 18 U.S.C. § 922 is unconstitutional because the Government cannot demonstrate that barring his possession of firearms is "consistent with the nation's historical tradition of firearm regulation;"[4] (5) whether the original preferral of charges in Appellant's case suffered from unlawful command influence; and (6) whether Appellant's domestic violence conviction is legally sufficient.[5]

Related to issue (2), on 16 December 2024 we remanded the record to the Chief Trial Judge of the Air Force to include in Appellant's record of trial the missing audio recording of Appellant's 26 June 2023 arraignment. The audio file has since been included in the record, and we find no further discussion or relief is necessary on this issue.

We have also carefully considered issue (4) raised by Appellant and find it does not require discussion or relief. *See United States v. Guinn,* 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)); *see also United States v. Vanzant*, 84 M.J. 671, 681 (A.F. Ct. Crim. App. 2024) (holding the 18 U.S.C. § 922 firearm prohibition notation included in the staff judge advocate's indorsement to the entry of judgment is beyond a Court of Criminal Appeals' statutory authority to review), *rev. granted*, __ M.J. __, No. 24-0182, 2024 CAAF LEXIS 640 (C.A.A.F. 17 Oct. 2024).

As to issue (5) we have carefully considered Appellant's contention and find it does not require discussion or relief. *See United States v. Guinn*, 81 M.J. 195,

---

over the rehearing on findings and sentence. "Once a [Court of Criminal Appeals] has jurisdiction of a case, no action by a lower court or convening authority will diminish it." *United States v. Johnson*, 45 M.J. 88, 90 (C.A.A.F. 1996) (footnote omitted) (quoting *United States v. Boudreaux*, 35 M.J. 291, 295 (C.M.A. 1992)); *see also United States v. Davis*, 63 M.J. 171, 177 (C.A.A.F. 2006) ("[J]urisdiction . . . was fixed for purposes of appeal, new trial, . . . and new review and action by the convening authority. A rehearing relates back to the initial trial and to the appellate court's responsibility to ensure that the results of a trial are just.").

[4] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

[5] Issues (5) and (6) were personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).[6]

We address issues (1) and (6) together. As to the remaining issues, due to an error by the military judge in announcing his findings, we affirm only the findings properly announced by the court and reassess the sentence accordingly. We affirm the findings and modify the sentence in our decretal paragraph below.

## I. BACKGROUND

The Charge and Specifications arose from a single domestic violence incident on 10 February 2020 between Appellant and his former girlfriend, CC, at Appellant's residence. The incident started when the two were arguing about the care of Appellant's beloved cat, Mittens, but the argument escalated and turned physical. Appellant was convicted of unlawfully strangling CC with his hand (Specification 1 of the Charge), and of unlawfully pinning CC to the floor by putting his knee on her stomach (Specification 4 of the Charge). The additional facts necessary to resolve the assignments of error are included below.

## II. DISCUSSION

### A. Announcement of Findings

#### 1. Additional Background

Prior to trial, Defense filed a motion alleging unreasonable multiplication of charges asking the military judge to merge all four specifications of the Charge for both findings and sentence. The military judge deferred ruling on the motion until it was ripe. After the military judge entered his findings of guilty to Specifications 1 and 4 as charged, the military judge orally ruled that he intended to "at least" merge Specifications 1 and 4 for sentencing but needed more time to consider a merger for findings.

When the military judge was ready to rule on the defense motion, he found Specifications 1 and 4 were unreasonably multiplied for findings *and* sentence. This ruling occurred after the military judge had already entered findings of guilty for the original Specifications 1 and 4, but before his sentence was announced. As a remedy for ruling the two specifications were unreasonably

---

[6] After granting a request by Appellant to attach the Board of Inquiry transcript to the record, we assumed without deciding that we could consider the transcript of a Board of Inquiry, dated 25 April 2024, when reviewing this issue. *United States v. Jessie*, 79 M.J. 437, 442–43 (C.A.A.F. 2020). This transcript contains, *inter alia*, Appellant's commander's testimony about his decision to prefer charges against Appellant in 2020.

multiplied, the military judge announced he was merging Specifications 1 and 4 of the Charge for both findings and sentencing. The military judge found that "Specifications 1 and 4 [were] not aimed at distinctly separate criminal acts but rather comprise[d] a single assault as they [were] united in time, circumstance, and impulse," citing to *United States v. Morris*, 18 M.J. 450 (C.M.A. 1984), as an instructive case on the issue.

As part of this ruling, the military judge announced modified language of Specification 1 in an attempt to reflect his merger of Specifications 1 and 4 for findings and sentence.[7] Specifically, the military judge announced:

> Specification 4 is merged with [S]pecification 1 of the [C]harge for both findings and sentencing purposes.

> Specification 1 of the [C]harge now reads "In that [Appellant], did, at or near, Las Vegas, Nevada, on or about 10 February 2020, commit an assault upon [CC], an intimate partner of [Appellant], by strangling her with his hand and did, at or near Las Vegas Nevada, on or about 10 February 2020, unlawfully pin [CC], an intimate partner of [Appellant], to the floor, by putting his knee on her stomach.

At this time, the military judge also dismissed Specification 4 by announcing, "Specification 4 of the [C]harge is dismissed. The dismissal of [S]pecification 4 of the [C]harge will ripen into dismissal with prejudice upon completion of appellate review."

The military judge did not announce withdrawal or reconsideration of his initial announcement of findings as to the original Specifications 1 and 4, nor did he announce new findings as to the modified "new" Specification 1 detailed above. The military judge also did not clarify if the "new" Specification 1 was a specification alleging assault consummated by a battery, an aggravated assault offense, or another violent offense. Neither the Government nor the Defense objected at trial to the military judge's ruling and no party objected to the military judge's announcement of the modified Specification 1 and conditional dismissal of Specification 4.

On 17 September 2024, we issued an order directing the Government to show cause why this court should not remand the record of trial back to the

---

[7] The original Specification 1 of the Charge read, "In that [Appellant], did, at or near Las Vegas, Nevada, on or about 10 February 2020, commit an assault upon [CC], an intimate partner of [Appellant], by strangling her with his hand." The original Specification 4 of the Charge read, "In that [Appellant], did, at or near Las Vegas, Nevada, on or about 10 February 2020, unlawfully pin [CC], an intimate partner of [Appellant], to the floor by putting his knee on her stomach."

trial judiciary and, *inter alia*, order a new hearing specifically to address the findings and sentence of the court, or take any other action required. On 16 October 2024, the Government answered the show cause order, opposing remand to reannounce or correct the announcement of the findings or sentence. On 23 October 2024, Appellant moved this court for leave to file and reply to the Government's answer to the court's show cause order, which we granted on 31 October 2024. Defense also opposed remand for correction to the findings announcement.[8]

**2. Law**

"When a military judge finds charges to be unreasonably multiplied, dismissal is one remedy available to him.[9] However . . . dismissal is not mandatory as it is within a military judge's discretion to instead merge the specifications . . . ." *United States v. Winters*, No. ACM 37915, 2013 CCA LEXIS 62, at *10 (A.F. Ct. Crim. App. 31 Jan. 2013) (unpub. op.) (citing *United States v. Campbell*, 71 M.J. 19, 25 (C.A.A.F. 2012)).

"[U]nreasonable multiplication of charges as applied to findings . . . requires [one] to determine whether merger *or* dismissal of the affected specifications is more appropriate." *United States v. Chin*, No. ACM 38452, 2015 CCA LEXIS 241, at *19–20 (A.F. Ct. Crim. App. 12 Jun. 2015) (unpub. op.) (emphasis added) (citing *Campbell*, 71 M.J. at 22–23) (discussing the options to merge or dismiss offenses that create an unreasonable multiplication of charges for findings)).

When specifications are merged, a finder of fact should ensure the findings of the court are clearly set forth in the record. *United States v. Whiteside*, 59 M.J. 903, 909 (C.G. Ct. Crim. App. 2004). An example of a merged specification can be found in *United States v. Hennis*, 40 M.J. 865, 870–71 (A.F.C.M.R. 1994). Our sister court stated:

> When specifications are merged for findings because of unreasonable multiplication, the result is supposed to be a new specification containing the allegations of the merged specifications. . . . Where specifications are merged for findings, there is no implication that an accused was not found guilty of any of the specifications that were merged, in contrast to the situation where a

---

[8] Notably, this court did remand Appellant's case on 6 December 2024 to the Chief Trial Judge, Air Force Trial Judiciary, for the sole purpose of including in Appellant's record of trial the missing audio recording of Appellant's 26 June 2023 arraignment. A detailed military judge complied with the order, and the court re-docketed Appellant's case on 10 January 2025.

[9] *United States v. Roderick*, 62 M.J. 425, 433 (C.A.A.F. 2006).

military judge grants dismissal of one or more specifications *rather* than merger.

*United States v. Fauntleroy*, Docket No. 1375, 2014 CCA LEXIS 942, at \*6 (C.G. Ct. Crim. App. 21 May 2014) (unpub. op.) (emphasis added) (footnote and citation omitted); *see also United States v. Thomas,* 74 M.J. 563 (N. M. Ct. Crim. App. 2014), *United States v. Gallegos*, No. ACM 38546, 2015 CCA LEXIS 349 (A.F. Ct. Crim. App. 26 Aug. 2015) (unpub. op.).

"'Findings' and 'sentence' are terms of art defined by the President in the [Rules for Court-Martial]. The findings include: '(A) a summary of each charge and specification; (B) the plea(s) of the accused; and (C) the finding or other disposition of each charge and specification.'" *United States v. Williams*, 2024 CAAF LEXIS 501, at \*11 (C.A.A.F. 2024) (quoting Rule for Courts-Martial (R.C.M.) 1101(a)(1)(A)–(C)).

"[A] finding on the guilt or innocence of the accused is not final until it is formally and correctly announced in open court." *United States v. London*, 15 C.M.R. 90, 96 (C.M.A. 1954); *see also* R.C.M. 922(a) ("Findings shall be announced in the presence of all parties after they have been determined."); Article 53, UCMJ, 10 U.S.C. § 853(a) ("A court martial shall announce its findings and sentence to the parties as soon as determined."). Both R.C.M. 922(d) and R.C.M. 1104 allow an error in the announcement of findings to be corrected by a new announcement made before or after adjournment.

"This court long ago accepted as a substantial right of an accused 'the right to announcement of all findings in open court.'" *United States v. Gates*, No. ACM S32504, 2018 CCA LEXIS 490, at \*6 (A.F. Ct. Crim. App. 12 Oct. 2018) (unpub. op.) (quoting *United States v. Timmerman*, 28 M.J. 531, 536 (A.F.C.M.R. 1989)). "However, though an error which affects a substantial right of an accused is presumptively prejudicial, 'the presumption may yield to compelling evidence in the record that no harm actually resulted.'" *Id.* (quoting *Timmerman*, 28 M.J. at 536) (additional citation omitted). "In this regard we look to the record as a whole to determine the intent of the trial court with respect to announcement of the findings." *Id.* (quoting *Timmerman*, 28 M.J. at 536).

### 3. Analysis

#### a. Merger and Dismissal of Specification 4

The Government argues that "it is clear from the record what the military judge's intent was," but that "if there was any arguable error by the military judge on findings or sentence, this [c]ourt has the authority to correct it without remanding the case for a rehearing." The Government also argues, without citing a rule, case, or statutory authority permitting it, that "[t]he military judge's unnecessary dismissal of Specification 4 after the merger into

Specification 1 does not require a rehearing, because the [c]ourt can correct the findings in the [Statement of Trial Results (STR)] and the [entry of judgment (EoJ)] to be consistent with the military judge's rulings and findings." The Government concludes, "[r]emanding for a rehearing would not promote judicial economy and would delay consideration of Appellant's issues on appeal. Moreover, reopening the findings raises the concern that it would trigger an unnecessary new sentencing proceeding, as well."

Appellant asserts that "the military judge's intent to effectuate merger for findings and sentence is clear on the record" but that a hearing with all parties is not necessary because "[t]he failure to execute this [merger] procedurally . . . is remediable." Appellant does not allege any prejudice related to the military judge's error in announcing findings or in the merging of Specifications 1 and 4 of the Charge.

We acknowledge that after finding Specifications 1 and 4 of the Charge unreasonably multiplied for findings and sentence, the miliary judge had the authority and discretion to either merge or dismiss Specification 1 or Specification 4. However, it was a legal impossibility to have done both. Therefore, there is no question the military judge erred by announcing both merger and dismissal of Specification 4 of the Charge. While the parties also acknowledge this error, they propose what the military judge "intended" is "obvious," and propose this court correct the announcement of findings.

We begin by noting perceived "intentions," however well-meaning, do not create authority. Cases cited by the Government in response to our show cause order do not cite to any authority we have to modify those findings as announced in open court by modifying post-trial documents. *See*, *e.g.*, *United States v. Brinkman-Coronel*, No. ARMY 20220225, 2024 CCA LEXIS 131 (A. Ct. Crim. App. 22 Mar. 2024) (unpub. op.); *United States v. Injerd*, No. ACM 40111, 2022 CCA LEXIS 727 (A.F. Ct. Crim. App. 20 Dec. 2022) (unpub. op.). What is in post-trial paperwork is not the ultimate issue here. What is at issue is that what was announced by the military judge in open court, as a whole, was incorrect. Further, the law is clear here that there were two legal courses of action for the military judge to have taken in his ruling—we are not inclined to speculate which one he intended, especially in a situation when he purported to do both. However, we cannot complete our analysis until we point out the additional complications in this case.

### b. "New" Specification 1

Although the military judge announced his intent to merge Specifications 1 and 4 of the Charge and announced a merged specification as "new" Specification 1 that appears on the entry of judgment, the military judge never announced findings as to the "new" Specification 1, nor did he withdraw his

original findings from the original, arraigned-upon Specifications 1 and 4. Stated another way, while it appears at first blush the military judge did both merger and dismissal, he never actually *completed* a merger of Specifications 1 and 4 on the record because he failed to withdraw his previous findings on the arraigned-upon specifications and, importantly, failed to announce a finding on the "new" merged Specification 1.

Further, it appears the military judge attempted to merge Specification 1 of the Charge alleging strangulation with Specification 4 of the Charge alleging a violent offense by assault consummated by a battery by creating the "new" Specification 1. However, "it is difficult to see how, pre-findings, an assault consummated by a battery offense and an aggravated assault could be merged into a coherent specification." *United State v. Boykin*, 2017 CCA LEXIS 400, at *4 (A.C.C.A. 12 Jun. 2017) (unpub. op.). Although post-findings in this case, it appears the "new" Specification 1 attempted to create a facially duplicitous specification, that is, a specification which alleged two separate crimes with separate elements: Article 128b(1), UCMJ (a violent offense), and Article 128b(5), UCMJ (strangulation). *See* R.C.M. 307(c)(4) ("Each specification shall state only one offense.")[10] However, we need not conclude this was error as Appellant affirmatively waived this issue at trial. *United States v. Mincey*, 42 M.J. 376 (C.A.A.F. 1995) (where "appellant did not object to the misjoinder of numerous bad-check offenses into one duplicitous specification; thus, he waived any complaint that he may now have about the pleadings" (citing R.C.M. 905(b)(2), (e))). Still, in light of this we are simply left with too many questions regarding the purported merger as it was effectuated at trial to conclude merger was clearly intended or appropriate.

So where does that leave us? In the interest of judicial economy, and importantly to ensure no prejudice to Appellant caused by further delay, we will resolve this on appeal without remand. We hold firmly to the principle, and Rules for Courts-Martial, that the finder of fact must properly announce his findings as to the specifications of the charge and the charge in the presence of all parties. *Williams*, 2024 CAAF LEXIS 501, at *11. It is antithetical to the Rules for Courts-Martial that announced findings could be significantly modified in post-trial paperwork to attempt to clarify otherwise ambiguous "intent." Again, although the military judge may have intended to merge the findings of Specifications 1 and 4, he never completed that merger by announcing those

---

[10] As part of the National Defense Authorization Act for Fiscal Year 2019, Article 128(b), UCMJ, was amended to include "strangulation" as "conduct constituting aggravated assault for purposes of the Uniform Code of Military Justice." Pub. L. No. 115-232, § 531, 132 Stat. 1636, 1759 (13 Aug. 2018). Aggravated assault is a different offense than an assault consummated by a battery, which was the underlying violent offense charged in Specification 4 of the Charge.

findings as to the merged "new" Specification 1. Therefore, without guessing as to the military judge's intentions, however well-placed, we will uphold the military judge's correct announcements on the record. Stated another way, we uphold the military judge's findings of guilty to the original, arraigned-upon Specifications 1 and 4 of the Charge, and then his announcement of a dismissal of Specification 4 with prejudice, such prejudice to attach upon completion of our review.

To be clear, the military judge properly announced and never rescinded the following finding as to the original Specification 1: "[Appellant], this court finds you: Of Specification 1, of the Charge: Guilty [. . .] of the Charge: Guilty." The military judge also announced the following on the record in open court: "Specification 4 of the charge is dismissed. The dismissal of [S]pecification 4 of the [C]harge will ripen into dismissal with prejudice upon completion of appellate review." These are the announcements we are upholding on appeal.

We note that this conclusion, to uphold Specification 1 of the Charge, and dismiss Specification 4 of the Charge, is consistent with the military judge's ruling that these specifications were unreasonably multiplied, as one remedy for such a ruling is to dismiss one of the specifications. Having reviewed the whole record, we determined this action is consistent with his intent.

Therefore, we uphold the finder of fact's finding of guilty as to the original arraigned-upon Specification 1: "In that [Appellant] did, at or near Las Vegas, Nevada, on or about 10 February 2020, commit an assault upon [CC], an intimate partner of [Appellant], by strangling her with his hand;" and hereby set aside the finding of guilty as to Specification 4 and dismiss Specification 4 with prejudice as was announced at trial.

## B. Legal and Factual Sufficiency

### 1. Additional Background

Appellant met CC, the victim, while stationed near Las Vegas, Nevada, at Creech Air Force Base. The two met in September of 2016, became romantically involved shortly afterward, moved in together in January 2017, and dated until approximately January 2018.

In the summer of 2017, Appellant, CC and her sons moved into a house owned by Appellant near Las Vegas which would later become the location of the assault at issue in this case. After Appellant and CC ended their relationship in 2018, they continued to amicably cohabitate until Appellant deployed in 2019. CC agreed to help take care of Appellant's three cats, including Mittens, when he was deployed. When Appellant returned home from his deployment, Appellant moved out of the home but agreed that CC and her sons could still live there as tenants who paid rent and cared for his cats until he was able to move the cats elsewhere.

In early 2020, Mittens inexplicably escaped CC's care and went missing from Appellant's home. On 10 February 2020, Appellant and CC met to have lunch, and CC and Appellant discussed Mittens who at this point had been gone awhile. Appellant and CC left lunch together in the same car and after running errands, they headed back to Appellant's home where CC was still living but Appellant was not. On that drive, Appellant and CC got into a heated verbal argument about CC's care of and responsibility for Mittens. The audio of this argument was recorded on the car dash camera, where the voices of both CC and Appellant were heard and introduced at trial.

Upon arriving at Appellant's house, CC and Appellant entered the home, which was unoccupied by anyone else at the time. The argument about Mittens continued and escalated. CC was "scared" of Appellant and disliked his yelling, so CC asked Appellant to leave, but Appellant refused. Appellant asked CC to leave, but she did not because "she had nowhere else to go." Soon the yelling turned physical, and CC recounted Appellant pushing and shoving her, grabbing her by the wrists and pushing her chest while they were in the kitchen.[11] As things escalated, CC was able to press "record" on her phone and capture the audio of the fight inside the home.

At some point during the altercation in the home, both Appellant and CC ended up on the floor of the living room. CC testified Appellant pushed her down to the floor, and CC tried to kick Appellant away. While CC was kicking, Appellant pulled her boot off her foot and then got on top of her and put "one of his knees on [her] stomach" and "put one of his hands on [her] neck." For a second or two, CC was scared because she could not breathe. Appellant did eventually get off CC. Portions of the audio recording from the argument include the following exchange:

> [CC:] Get out.
>
> [Appellant:] No.
>
> [CC:] You just assaulted me.
>
> [Appellant:] You're lucky I didn't snap your f[**]king neck. You killed my baby [Mittens].
>
> . . . .
>
> [CC:] I did not kill your cat.
>
> [Appellant:] Fine, you lost him. But if he's outside, he's already dead and that's on you.

---

[11] This conduct was captured in Specifications 2 and 3 of the Charge, and Appellant was acquitted of this conduct.

[CC:] Oh yeah, and that's my fault and I'm supposed to be here physically assaulted and getting yelled at because of it?

[Appellant:] Physically, physically assaulted----

[CC:] Did you just not push me and choke me, and pull my hair, and grip on my -- my wrists.

[Appellant:] How many times did you throw a punch?

[CC:] I was trying to push you off.

[Appellant:] I wasn't even on you at that point.

Both Appellant and CC admitted that CC scratched Appellant on his upper body at some point during the altercation but are unsure when during the altercation it occurred. CC testified she was only defending herself or trying to get Appellant away from her by pushing, scratching, or kicking. During the altercation, CC realized she had inadvertently urinated in her pants. This prompted CC to retreat to the bedroom to change her clothing. Appellant followed her there and continued his verbal altercation despite CC's requests for him to leave. Eventually CC changed and left the house.

Later that evening, on 10 February 2020, a witness observed CC acting unusual, more "subdued" than the witness was used to observing her. CC told this witness she was distracted because she had been "beaten" or "abused" or "attacked" about a pet-sitting situation. CC also had dinner with a friend and romantic interest, RW, on 18 February 2020. During this dinner, RW noticed bruises on CC. When confronted about the bruises, CC was silent and uncomfortable with the questions. A few days later, RW again went to brunch with CC. He saw the same bruises, and this time took a picture of them without her knowing. These photos were entered into evidence at trial.

CC testified that after the altercation she had bruising on her chest, arms and between her fingers. CC did not take photographs of the bruises on her own because she did not plan to report the assault to authorities. In fact, she did not report the assault to law enforcement and does not know who did.

A few days after the assault, and through civilian court channels, Appellant had a protective order served on CC, and CC soon reciprocated and had a protective order served on Appellant. On 5 March 2020, there was a joint hearing on the protective orders in civilian court. Both Appellant and CC testified at this hearing. CC's testimony was substantially the same as her testimony at the court-martial as it related to the pushing and grabbing in the kitchen. Appellant heard CC's testimony about the kitchen and told the civilian judge that what CC said "was pretty much on point" but disagreed with how the altercation started in the kitchen before he grabbed her wrists. Appellant also

admitted to this judge that CC had fingerprint bruises on her wrists and upper arms because of that altercation in the kitchen.

CC was hesitant to play the portion of the phone-recorded audio for the civilian judge related to the living room incident where Appellant had placed his hand on her neck and knee in her chest because it was an emotional event for her to rehear. Eventually, CC did play this portion of the audio before the civilian judge, and as result, the judge asked Appellant about it. When questioned by the civilian judge about the living-room incident, Appellant admitted the following.

> [W]hen you hear [CC] choking, that was when she had fallen over. First, she started kicking me. I grabbed her by the back of the ankle to stop her from being able to kick. She yanked her foot back, that's how her foot came out of the boot. I threw it on the ground, and she picked it up and threw it at the back of my head along with a couple of other things. At which point, I turned around, climbed on top of her, put one knee in her gut, and my left knee against her throat. Pushing it up against her jugular on the right side of her neck and rolled -- rolled it pretty much across her neck to cut off the flow of blood so, I can restrain her and keep her from attacking me any further.

The recording of this civilian court hearing was admitted into evidence at Appellant's court-martial.

After someone reported this 10 February 2020 assault to police, CC was called in for questioning at the Air Force Office of Special Investigations on 7 March 2020, and more pictures of her bruising were taken by agents and later entered into evidence.

Two witnesses testified as to CC's good character for peacefulness and truthfulness. Several witnesses testified as to Appellant's good character for peacefulness and truthfulness and good military character.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable

inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017), (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

We apply the test for factual sufficiency applicable to the time of Appellant's original trial. That test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

As charged, the elements of the specification alleging strangulation in violation of Article 128b, UCMJ, of which Appellant was convicted, include: (1) that at or near Las Vegas, Nevada, Appellant assaulted CC, the intimate partner of Appellant; (2) that Appellant did so by strangling CC with his hand; and (3) that the strangulation was done with unlawful force or violence. *See Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*), pt. IV, ¶ 78a.b.(6).[12]

The term "intimate partner" means " either "(a) one's former spouse, a person with whom one shares a child in common, or a person with whom one cohabits or with whom one has cohabited as a spouse; or (b) a person with whom one has been in a social relationship of a romantic or intimate nature, as determined by the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship." 2024 *MCM*, pt. IV, ¶ 78a.c.(3). The term "strangulation" means "[i]ntentionally, knowingly, or recklessly impeding the normal breathing or circulation of

---

[12]The offense occurred in the year 2020, but the President did not set forth the elements of the offense until years later. *See* Exec. Order 14,062, 87 Fed. Reg. 4763 (26 Jan. 2022). Appellant did not challenge the later-stated elements of the offense at trial or now on appeal.

the blood of a person by applying pressure to the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim." 2024 *MCM*, pt. IV, ¶ 77.c.(5)(c)(iii).

Self-defense is an affirmative defense to the offense and has three elements. For self-defense to apply,

> First, the accused must have apprehended, on reasonable grounds, that bodily harm was about to be inflicted on him; second, the accused must have believed that the force he used was necessary for protection against bodily harm; and, third, the force used by the accused must have been "less than force reasonably likely to produce death or grievous bodily harm."

*United States v. Turner*, No. ACM 39706, 2020 CCA LEXIS 428, at \*21–22 (A.F. Ct. Crim. App. 25 Nov. 2020) (unpub. op.) (quoting R.C.M. 916(e)(3)). The right to self-defense is lost "if the accused was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006); *Turner*, unpub. op. at \*22 (citations omitted).

Failure to retreat, when retreat is possible, does not deprive a person of the right to self-defense. R.C.M. 916(e)(4), Discussion. The availability of avenues of retreat is one factor that may be considered in addressing the reasonableness of a person's apprehension of bodily harm and the sincerity of the person's belief that the force used was necessary for self-protection. *Turner*, unpub. op. at \*8. Once raised, the prosecution has the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1).

### 3. Analysis

Given our dismissal of Specification 4 *supra*, we will only review the legal and factual sufficiency of the original Specification 1 of the Charge. Appellant asserts his conviction is not legally or factually sufficient because "audio alone cannot convict Appellant," and "[b]ecause the conviction rests heavily upon CC's fatally flawed testimony." For the reasons discussed below, we disagree with Appellant's assertions. We conclude that after viewing the facts in the light most favorable to the Government, a reasonable finder of fact could find Appellant guilty of all the elements of strangulation of CC, an intimate partner of Appellant, beyond a reasonable doubt. We too are convinced of Appellant's guilt beyond a reasonable doubt.

Appellant is correct that to prove the original Specification 1, the Government relied on the testimony of CC, as well as the audio recording from the dash camera, audio from the actual incident, and the civilian court hearing audio. But that is not all. The Government also introduced corroborating witnesses with whom CC discussed the assault immediately afterwards, and who saw some of the bruising from the incident on CC's body. Importantly, the Government also had admissions from Appellant that substantially corroborated CC's testimony, confirming there was an incident in his home with CC on the charged day, and almost exactly the way CC described. In fact, Appellant admitted to climbing on top of CC and intentionally cutting off her airway in the living room as a way of restraining her ability to defend herself. The only conflicting testimony between CC and Appellant related to which body part of Appellant's was on CC's neck—that is, whether Appellant strangled her with his hand as CC said, or if Appellant used his knee as Appellant admitted. Specifically, Appellant admitted he "turned around, climbed on top of her . . . [put his] left knee against her throat. Pushing it up against her jugular on the right side of her neck and rolled -- rolled it pretty much across her neck to cut off the flow of blood so, [he] can restrain her and keep her from attacking [him] any further."

### a. Legal Sufficiency

While Appellant admitted to a different type of assault on CC, a reasonable finder of fact could have given more weight to the testimony of CC and her memory of the event. When confronted with the inconsistency of Appellant's version of events, CC was unwavering in her testimony that it was Appellant's hand on her neck. She also testified that she was sure it was not his knee on her neck and the rolling motion, adamantly denying it and stating, "that probably would have killed me." The finder of fact was able to assess credibility related to her testimony, and a finder of fact may "believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979). Looking at these facts in the light most favorable to the Government, a finder of fact could believe CC and disbelieve Appellant. Such a finding would not be entirely reliant on "audio" alone, but rather careful weighing of admissions by Appellant, as well as the credibility of CC and corroborating evidence.

Appellant also asserts that "CC lacked memory of what happened and downplayed her own role. Her direct testimony involved as much media—the dashcam, the audio of the incident, and the family court hearing—as actual testimony." However, on appeal, a lack of memory alone is not evidence of conflicting facts. Even if it were, the evidence need not be free from conflict to find the conviction legally sufficient. Appellant's attempt to downplay the multiple media recordings of the incident, while clever, diverts attention from other

critical evidence in the case. We have reviewed the entire record of trial and conclude there were no material discrepancies in proof. The Defense did not meaningfully impeach CC's credibility, and—based upon her testimony alone—a reasonable finder of fact could conclude each of these acts amounted to unlawful strangulation. We find, considering the evidence in the light most favorable to the Government, that CC's testimony and the admitted additional corroborating evidence was sufficient for a reasonable finder of fact to conclude convincing proof of each element of the offense beyond a reasonable doubt. CC testified that Appellant put his hand around her neck while on top of her, and for one or two seconds she "couldn't breathe" and the "look in his eyes" was worse than anger; it was "rage."

Accordingly, we find Appellant's conviction for domestic violence via strangulation against CC legally sufficient.

### b. Factual Sufficiency

Also, while we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the finder of fact at trial saw and heard the testimony. *See, e.g., United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased). Like the finder of fact at trial, we also weigh the evidence in the record and determine whether a discrepancy in a witness's testimony—including a lapse of memory—resulted from an innocent mistake or a deliberate lie. *See United States v. Goode*, 54 M.J. 836, 844 (N.M. Ct. Crim. App. 2001). Moreover, having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

### c. Self-Defense

In conducting both our factual and legal sufficiency review, we considered the affirmative defense of self-defense. We are convinced that Appellant did not act in self-defense while strangling CC with his hand. If a finder of fact gives absolute credit to CC's testimony, Appellant would have no viable self-defense claim, as he was the initial aggressor. CC said she did punch and scratch Appellant, but this was immediately after Appellant was grabbing her; thus, a rational finder of fact could conclude CC was fighting back—that is, exercising her own self-defense rights—rather than initiating an attack or escalating the level of the conflict. Regardless of who was the initial aggressor, it was Appellant who escalated the violence in the living room by heightening what had been, at best, a mutual affray of punches and pushing, to an aggravated assault of his intimate partner who was on the ground and not a threat to Appellant. Rather than leave her on the ground alone, Appellant advanced

toward her, climbed on top of her and then strangled her. A rational finder of fact could conclude CC did not escalate the level of conflict by being on the floor and throwing a shoe but instead was trying to defend herself or de-escalate the conflict. Moreover, a finder of fact could readily determine there was no reliable evidence presented that, once CC was on the floor, Appellant reasonably believed bodily harm was about to be inflicted on him, or that he believed strangling CC was necessary to protect himself. Although Appellant explained he climbed on top of CC and impeded her airway to keep her from attacking him any further, this action was significantly more force than necessary to protect himself under the circumstances, and therefore Appellant abandoned any justification for self-defense. Further, although Appellant was not required to retreat, the totality of his actions, including his decision to ignore CC's repeated requests to leave undercut his contention that he reasonably believed he was at risk of physical harm or that he actually believed he needed to assault CC by climbing on top of her and putting his hand on her neck when she was already on the ground in order to protect himself.

Therefore, under both the legal and factual sufficiency standard, we find that Appellant was not entitled to the defense of self-defense for the original Specification 1 of the Charge.

## C. Sentence Reassessment

Having set aside the finding of guilty to Specification 4 of the Charge related to Appellant putting his knee in CC's stomach, and affirming the original Specification 1 of unlawful strangulation, we must evaluate whether we should reassess the sentence or return this case for a sentence rehearing. We have concluded we can reassess the sentence and do so below. We reassess the sentence to the same sentence as entered.

### 1. Additional Background

The military judge sentenced Appellant and merged his sentence into one sentence for both Specifications 1 and 4 of the Charge. The military judge found that "Specifications 1 and 4 [were] not aimed at distinctly separate criminal acts but rather comprise[d] a single assault as they [were] united in time, circumstance, and impulse." The military judge sentenced Appellant as follows: "To be reprimanded. To forfeit $6,127.00 pay per month for five months. And to be confined for five months." The convening authority disapproved the reprimand and reduced Appellant's forfeiture to $925.00 pay per month for five months.

### 2. Law

To reassess a sentence, a CCA must be able to reliably ascertain "what sentence would have been imposed at the trial level if the error had not occurred." *United States v. Sales*, 22 M.J. 305, 307 (C.M.A. 1986). The CCA must also be

18

able to determine that absent the error the "sentence would have been at least of a certain magnitude." *Id.* We may affirm only as much of a sentence as we find correct in law and fact. Article 66(b), UCMJ, 10 U.S.C. § 866(b).

Our superior court has set forth a list of non-exhaustive factors that CCAs may consider in determining whether to reassess a sentence or permit a rehearing, including: (1) whether there are "[d]ramatic changes in the penalty landscape or exposure;" (2) whether the appellant was sentenced by members or by military judge alone; (3) whether the "remaining offenses capture the gravamen of criminal conduct included within the original offenses;" and (4) "[w]hether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013) (citations omitted). We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *Id.* at 13 (citation omitted). If we cannot determine that the sentence would have been at least of a certain magnitude, we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

### 3. Analysis

Under all the circumstances presented, we find that we can reassess the sentence and it is appropriate for us to do so. There is only a marginal change in the penalty landscape and exposure as the remaining offense committed by Appellant subjected him to a maximum of a dismissal, confinement for eight months, and to forfeit all his pay and allowances.[13] At his trial, a military judge sentenced Appellant. The remaining offense captures the gravamen of the criminal conduct for which the Appellant was sentenced, and there is no change in admissible sentencing evidence. Additionally, we have significant experience and familiarity with the offense that remains and conclude that sentence reassessment is appropriate. Absent the error, we are confident that the court-martial would have imposed a sentence no less severe than five months' confinement and forfeiture of $925.00 pay per month for five months. Indeed, because Appellant remains convicted of the gravamen offense, and because the evidence of the circumstances surrounding the convicted offense would have been the same as originally considered by the military judge, we are confident in our reassessment. Judges of the CCAs "are more likely to be

---

[13] R.C.M. 810(d)(1) states that "[e]xcept as otherwise provided in paragraph (d)(2), the new adjudged sentence for offenses on which a rehearing, new trial, or other trial has been ordered shall not exceed or be more severe than the original sentence as set forth in the judgment under R.C.M. 1111." Appellant's case does not meet an exception for R.C.M. 810(d)(2), and so his maximum allowable sentence was what he received at his first court-martial.

certain of what a military judge would have done as opposed to members." *Winckelmann*, 73 M.J. at 16. There was nothing particularly unique or unusual about this case, and the same evidence was relevant in sentencing proceedings regardless of whether Appellant remained convicted of putting a knee on CC's stomach while putting his hand on her neck.

## D. Timely Appellate Review

Appellant claims that he is entitled to sentence relief from this court "because the Government's dilatory processing violated [*United States v.] Moreno*, [63 M.J. 129 (C.A.A.F. 2006)]." Appellant further claims that "even if this court were to find no prejudice from the due process violation, [Appellant] is nevertheless entitled to relief under *Gay, Toohey, and Tardif*.[14]" Appellant notes "his legal process has stretched on for four years and was marked by innumerable errors. This latest iteration is but the culmination of that error-filled process." Therefore, *Tardif* relief is the "primary mechanism by which [Appellant] has requested relief." For the reasons set forth below, we decline to give relief.

### 1. Additional Background

Appellant was sentenced on 12 July 2023, and the military judge entered judgment on 18 September 2023—68 days later. According to the chronology contained within the record of trial, the detailed court reporter worked on at least eight different courts-martial and other hearings, either live and in session or conducting transcription and record certification, until 25 September 2023. The court reporter completed the draft trial transcript on 16 October 2023 and sent it to counsel for review. The court reporter received edits from counsel and updated the trial portion of the transcript by 23 October 2023—103 days after Appellant was sentenced. Once the transcribed record from previous sessions was completed, the transcript and record of trial were certified on 6 November 2023 and forwarded to the legal office—117 days after Appellant was sentenced. A week later, on 15 November 2023, the original record of trial was forwarded to the Air Force Appellate Records Branch (AF/JAJM) and received by AF/JAJM on or about 5 December 2023. Appellant's case was then docketed with this court on 14 December 2023—155 days after sentencing. This court granted Appellant's five requests for enlargements of time to file his assignments of error brief—totaling 217 days from sentencing.

### 2. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *Moreno*, 63 M.J. at 135 (citations

---

[14] *United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2015) ; *United States v. Toohey*, 63 M.J. 353 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

omitted). We review the question of whether an appellant's due process rights are violated because of post-trial delay de novo. *Id.*; *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citation omitted).

In a due process analysis, a presumption of unreasonable delay arises when a case is not docketed with this court within 150 days from sentencing. *Livak*, 80 M.J. at 633 (citation omitted). This threshold, adapted from the standards set forth in *Moreno*, "is not, by any means, a particularly onerous processing goal." *Gay*, 74 M.J. at 743–44. "In fact, a delay in this phase of post-trial processing is 'the least defensible of all and worthy of the least patience.'" *Id.* (quoting *United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990)). "[T]his stage involves no discretion or judgment; and, unlike an appellate court's consideration of an appeal, this stage involves no complex legal or factual issues or weighing of policy considerations." *Id.* (alteration in original).

A presumptively unreasonable delay triggers an analysis of the four factors in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). While a presumptively unreasonable delay satisfies the first factor, the Government "can rebut the presumption by showing the delay was not unreasonable." *Id.* at 142. When assessing the fourth factor of prejudice, "we consider the interests of prevention of oppressive incarceration pending appeal; minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and limitation of the possibility that . . . grounds for appeal, and . . . defenses in case of reversal and retrial, might be impaired." *United States v. Cabuhat*, 83 M.J. 755, 773 (A.F. Ct. Crim. App. 2023) (omissions in original) (citing *Moreno*, 63 M.J. at 138–39). In the absence of such prejudice, a due process violation exists only when "the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362.

Even in the absence of a due process violation, we "may provide appropriate relief if [Appellant] demonstrates . . . excessive delay in the processing of the court-martial after the judgment was entered into the record." Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2). This authority under Article 66(d)(2), UCMJ, to grant relief for excessive post-trial delay does not require a showing of "actual prejudice" within the meaning of Article 59(a), UCMJ. *Tardif*, 57 M.J. at 224 (citation omitted). The essential inquiry is whether, given the post-trial delay, the sentence "remains appropriate[ ] in light of all circumstances." *Toohey*, 63 M.J. at 362–63 (citation omitted).

In determining whether the sentence remains appropriate considering post-trial processing delay, we consider the following factors:

1. How long did the delay exceed the standards set forth in [*Moreno*]?

2. What reasons, if any, has the [G]overnment set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?

3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?

4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?

5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?

6. Given the passage of time, can this court provide meaningful relief in this particular situation?

*Gay*, 74 M.J. at 744.

We consider no single factor dispositive, and a given case may reveal other appropriate considerations for this court in deciding whether post-trial delay has rendered an appellant's sentence inappropriate. *Id.* (footnote omitted).

**3. Analysis**

We have carefully considered Appellant's claim and find there is no due process violation or cause for relief under *Moreno*. Acknowledging that the 155-day delay is presumptively unreasonable in this case, the extra five days and remaining *Barker* factors do not weigh in Appellant's favor to warrant relief.

Appellant's case was docketed with the court on 14 December 2023, 155 days after Appellant's sentencing. The reasons for the delay include no unique processing timelines, and the Government exceeded the threshold for timeliness by five days for no obvious reason. However, the facts of this case, in total, certainly do not amount to bad faith or gross indifference in the case. Other than the longer time required for Appellant to file his brief, Appellant has claimed no additional prejudice. We find his claim of prejudice is nothing more than a general assertion of prejudice which does not warrant relief, and we find no additional prejudice. Because we find no particularized prejudice, and the delay is not so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, we conclude there is no due process violation.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, or *Tardif* in the absence of a due process violation. *See id.* Considering all the facts and circumstances of Appellant's case and the factors this court established in *Gay*, we decline to exercise our Article 66(d), UCMJ, authority to grant relief for the delay in completing appellate review.

### III. CONCLUSION

The finding of guilty for Specification 4 of the Charge is **SET ASIDE**, and Specification 4 of the Charge is **DISMISSED WITH PREJUDICE**. We order correction to the entry of judgment for Specification 1 of the Charge, to be entered as follows:

> Did, at or near Las Vegas, Nevada, on or about 10 February 2020, commit an assault upon C.C., an intimate partner of the accused, by strangling her with his hand.

We affirm only the findings of guilty to Specification 1 of the Charge, as entered above, and the Charge. We affirm only so much of the sentence as provides for confinement for five months and forfeiture of $925.00 pay per month for five months. The findings, as entered, and the sentence, as modified, are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings, as entered, and the sentence, as modified, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court